# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-IA-01762-SCT

*CHRISTOPHER POLLAN*

*v.*

*ANDREW WARTAK, M.D., INDIVIDUALLY AND d/b/a INTERNAL MEDICAL ASSOCIATES; CLAY COUNTY MEDICAL CORPORATION d/b/a NORTH MISSISSIPPI MEDICAL CENTER-WEST POINT; ANGIE TURNAGE, C.L.P.N.; WILLIAM C. LARMOUR, R.N.; AND ASHLEY THOMAS DAVIS, R.N.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/03/2015 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | ALAN D. LANCASTER |
| | JOHN M. MONTGOMERY |
| | DAVID UPCHURCH |
| | JOHN WHEELER |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DOLTON W. McALPIN |
| | ALAN D. LANCASTER |
| | JOHN M. MONTGOMERY |
| | JOHN STUART MOORE |
| ATTORNEYS FOR APPELLEE: | JOHN MARK McINTOSH |
| | DAVID W. UPCHURCH |
| | JOHN G. WHEELER |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 12/07/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.    Christopher Pollan filed a medical negligence action against Dr. Andrew Wartak, North Mississippi Medical Center-West Point; Angie Turnage, LPN; Chase Larmour, RN; and Ashley Thomas, LPN, claiming that the defendants' medical negligence caused the death of his mother, Shirley Pollan.  The trial court granted partial summary judgment to the defendants, finding that Pollan's survival claims were barred by the statute of limitations. Finding no error, we affirm the trial court's judgment.

**FACTS**

¶2.    On October 8, 2008, fifty-five-year-old Shirley Pollan ("Shirley") was taken to the emergency department at North Mississippi Medical Center-West Point ("NMMC-West Point") with complaints of dizziness, vomiting, and an inability to stand.  Blood tests revealed that her blood sodium level was a critically low 97 mEq/L.[1]  Intravenous fluids were administered to correct her sodium levels, and she was admitted to the intensive care unit to the service of Dr. Andrew Wartak.  During her time in intensive care, Shirley continued to receive IV fluids to normalize her blood sodium levels. According to the existing guidelines at the time, blood sodium levels should not be increased by more than ten to twelve points in the first twenty-four hours and eighteen points in the first forty-eight hours. Shirley's medical records show that her sodium levels were increased by nineteen points in the first fifteen hours and twenty-one points in approximately thirty-one hours.

¶3.    On October 11, 2008, at Pollan's request, Shirley was transferred to NMMC-Tupelo, where she remained until October 14, 2008.  Her diagnosis upon discharge was "severe

---

[1] A normal blood sodium level is between 136 and 145 mEq/L.

hyponatremia secondary to syndrome of inappropriate antidiuretic hormone with mental status changes."[2] It was noted in her discharge record that "she might be suffering from central pontine myelinolysis," or CPM, a brain cell dysfunction caused by the destruction of the myelin sheath covering the nerve cells in the pons, in the middle of the brain. CPM can be caused by a rapid rise in the body's sodium levels.

¶4. Shirley was incapable of returning to work after her discharge from NMMC-Tupelo, and over the next two years she was treated for numerous behavioral and neurological issues. On August 9, 2010, Shirley visited her primary care physician, Dr. Clifton Story, at the Longest Student Healthcare Center in Starkville. Dr. Story's record of this visit provides, in pertinent part:

> To summarize, she had been well prior to October 2008, working as a teller at the bank where she worked many years. She had gotten acutely ill, went to the ER and was found to be hyponatremic. During the hospitalization her sodium was corrected quickly. She deteriorated in the hospital, apparently becoming nearly comatose and was transferred to Tupelo at the insistence of her son.

> She did improve subsequently but has never returned to her normal state of being and is now disabled due to the mental deficits and inability to perform the task required of her to work at the bank. Her only medical diagnosis really has been SIADH and polydipsia and some psychosis initially following the hospitalization. I think it is reasonable to get a second opinion as to SIADH may have been the initial cause of the hyponatremia. However, I think the sodium was corrected quickly and she may have developed [CPM] which may have led to her chronic disability that she is now managing.

---

[2] Hyponatremia is defined as low sodium concentration in the blood. It can be caused by Syndrome of Inappropriate Diuretic Hormone Secretion (SAIDH), which occurs when the pituitary gland releases excessive antidiuretic hormone. SAIDH increases the amount of water in a person's blood while decreasing plasma sodium levels.

Dr. Story's records also indicate that Shirley was "able to articulate well with normal/speech language" during the visit and "[had] appropriate memory for current and past events." Dr. Story referred Shirley to Feiyu Chen, M.D., a neurologist at the Semmes Murphey Clinic in Memphis.

¶5.     On August 24, 2010, prior to Shirley's visit at the Semmes Murphey Clinic, a patient profile was filled out either by Shirley or someone on her behalf. The patient profile describes Shirley's "chief complaint" as follows:

> Fatigue and delirium initially 10/08/08 and discovered had suffered from a critical sodium and potassium drop that led to a coma at the North MS Health (Clay County Medical Center), West Point, MS 10/08/08. Transferred to critical care unit North MS Health Tupelo, MS. Family told best case scenario she was not expected to leave the hospital because of in such severe condition upon arrival from the West Point hospital and that the best case scenario would probably be a vegetative state the rest of her life if she were to be able to leave the hospital. Indicated that they appeared misdiagnosed, brain flooded with IV (liquids) too quickly and then removed too quickly based on the safe levels, it was too rapid of administration trying to increase the levels. Behavioral issues resulted and she was nowhere close to performing a normal life compared to time prior to this disabling condition.

Shirley was seen by Dr. Chen on the following day. Dr. Chen's report from this visit indicates that he initially was suspicious of CPM, but Shirley was "doing fine right now from a neurological standpoint." Dr. Chen ultimately did not think that Shirley had CPM.

¶6.     Shirley's health continued to decline until she ultimately passed away on January 18, 2011. An autopsy was performed on January 24, 2011, but the autopsy report was not issued until July 11, 2011. The report lists Shirley"s cause of death as "[CPM] following rapid sodium correction."

4

¶7. Pollan filed a wrongful death suit against the defendants on January 10, 2013, in the Clay County Circuit Court. The complaint alleged that the defendants negligently failed to render proper medical treatment to Shirley specifically concerning her blood sodium levels, which caused her to develop CPM. Pollan's claims for damages were separated into wrongful death claims, survival claims, and estate claims. Each of the defendants filed an answer to the complaint in March 2013, and each defendant raised the statute of limitations as a defense.

¶8. On March 6, 2015, after discovery had concluded, Dr. Wartak filed a Motion for Partial Summary Judgment, which the other defendants joined. The defendants argued that the statute of limitations for Pollan's survival claims began to run, at the earliest on October 14, 2008, when Shirley was discharged from NMM-Tupelo. Alternatively, the defendants alleged that, at the latest, the statute of limitations began to run on November 17, 2008, when Shirley visited her primary physician and attributed her neurological problems to her admission to NMMC-West Point. Because Pollan's complaint was filed more than two years after either of those dates, the defendants claimed that Pollan's survival claims were time-barred. In response, Pollan asserted that the statute of limitations began to run no earlier than July 11, 2011, when Shirley's autopsy report confirmed that her cause of death was CPM.

¶9. On November 3, 2015, the trial court issued an order granting the defendants' motion for partial summary judgment. The trial court determined that the statute of limitations for Pollan's survival claims had begun to run on August 24, 2010, when Shirley's patient profile

at the Semmes Murphey Clinic identified her treatment at NMMC-West Point as the cause of her neurological deficiencies:

> While it appears that Ms. Pollan did not know that she suffered specifically from[CPM], this patient profile clearly shows that on August 24, 2010 she (1) knew that she was suffering from a neurological deficiency; and (2) she at least suspected that this deficiency was the result of the procedure performed at North Mississippi Medical Center – West Point.

Because Pollan's complaint was not filed within two years of that date, the trial court held that Pollan's survival claims were time-barred.

¶10.    This Court granted Pollan's petition for interlocutory appeal on May 11, 2016. On appeal, Pollan raises three issues. First, he claims that the trial court erred in failing to consider his argument that the defendants waived their statute-of-limitations defense. Second, he contends that the trial court misapplied the discovery rule by finding that the statute of limitations began to run when Shirley suspected that her neurological deficiencies were the result of her treatment at NMMC-West Point. And finally, he argues that the date on which Shirley discovered her injury is a genuine issue of material fact that precludes summary judgment. Because the second and third issues are so closely related, we have combined them in our discussion below.

## STANDARD OF REVIEW

¶11.    The standard of review for the waiver of an affirmative defense is abuse of discretion. ***Kinsey v. Pangborn Corp.***, 78 So. 3d 301, 306 (Miss. 2011). Under this deferential standard, we must affirm the trial court's ruling unless there is a firm and definite conviction that the

6

trial court committed clear error. *Ashmore v. Mississippi Auth. on Educ. Television*, 148 So. 3d 977, 982 (Miss. 2014).

¶12. The standard of review for a trial court's grant of summary judgment is de novo. *Webb v. Braswell*, 930 So. 2d 387, 395 (Miss. 2006). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). The reviewing court must view the evidence in the light most favorable to the nonmovant, and the moving party bears the burden of showing the absence of a genuine issue of material fact. *Duckworth v. Warren*, 10 So. 3d 433, 436 (Miss. 2009). The running of the statute of limitations is an issue appropriate for resolution via summary judgment if there exists no genuine issue of material fact concerning whether the statute has run. *MS Comp Choice, SIF v. Clark, Scott & Streetman*, 981 So. 2d 955, 962 (Miss. 2008).

## DISCUSSION

I.      **Whether the trial court erred in ruling that the defendants had not waived the statute-of-limitations defense.**

¶13. On appeal, Pollan appears to present two different arguments concerning the defendants' alleged waiver of their statute-of-limitations defense. First, from a procedural standpoint, Pollan alleges that the trial court erred in failing to consider his waiver argument. Next, turning to the merits of the issue, Pollan argues that the defendants' unjustified delay in pursuing their statute-of-limitations defense, coupled with their active participation in the litigation process, served as a waiver of that defense.

7

¶14.    We find both arguments to be without merit.  While we cannot say that its analysis was detailed, the trial court did not ignore Pollan's waiver argument.  The transcript of the summary-judgment hearing reflects that the trial court considered and rejected the argument, finding that it was in the parties' interest to engage in discovery in order to develop the issue. We do not find that the trial court abused its discretion by failing to specifically mention Pollan's waiver argument in its order granting partial summary judgment to the defendants. In response to the defendants' motion for partial summary judgment, Pollan claimed that the defendants had unreasonably delayed their pursuit of the statute-of-limitations defense by actively participating in the litigation for more than two years after filing their answers to the complaint.  During that time, Pollan alleged that the defendants engaged in extensive discovery unrelated to the statute-of-limitations issue.  Accordingly, Pollan argued that the defendants had waived their statute-of-limitations defense.  At the hearing on the defendants' motion for partial summary judgment, Pollan attempted to argue the issue of waiver, but the trial court rejected his argument, reasoning:

> I've been on the bench 13 years now going on. I don't think I've routinely dismissed things upon the filing of a lawsuit. I think my history has been to let things develop and then -- you know, out of fairness to both sides.
>
> So I will tell you off the bat, I'm not inclined to say that I'm not going to let somebody claim the statute of limitations when I think it's to everybody's benefit to be able to engage in some discovery and try to figure out what really happened.
>
> So, I'm not inclined to do that. Because then if I send that message then, every time ya'll file a lawsuit, they're going to rush right in and say, Judge, statute of limitations, let's dismiss this thing. Then I'm having to try and guess totally blind.

8

And I don't think that that's a good thing. So, I would move along from that argument. Because that one is not going to carry the day with me. Maybe with the Supreme Court, but we (sic) me, not so much."

Pollan responded, "Your honor, it's totally in the Court's discretion of that . . . . And the Supreme Court is not going to overrule that decision. I feel very confident about that."

¶15.    As for the substance of Pollan's claim, the instant case is a factually complex medical malpractice action involving multiple defendants and raising several categories of claims, which required factual development beyond the initial pleadings.  This Court previously has found that a defendant did not waive its statute-of-limitations defense by engaging in discovery to develop that defense. *See Empire Abrasive Equip. Corp. v. Morgan*, 87 So. 3d 455, 461 (Miss. 2012) (while defendants participated in litigation for more than two years before moving for summary judgment on statute-of-limitations grounds, this Court held that "discovery [was] necessary for the defendants to determine the nature of their defense."). Here, the defendants bore the burden of proving that the statute of limitations for Pollan's survival claims had expired, and they relied directly on evidence obtained in discovery to support their argument. In addition, Pollan has failed to show how he was prejudiced by the defendants' delay in pursuing their statute-of-limitations defense. *See MS Credit Ctr., Inc. v. Horton*, 926 So. 2d 167, 180 n.7 (Miss. 2006) (noting that prejudice to the nonmoving party is a factor to be considered in addressing waiver).  Accordingly, we hold that the trial court did not abuse its discretion in failing to find that the defendants had waived their statute-of-limitations defense.

9

**II.** **Whether the trial court erred in finding that the statute of limitations for Pollan's survival claims began to run on August 24, 2010.**

¶16. The application of the statute of limitations is a question of law. ***Stringer v. Trapp***, 30 So. 3d 339, 341 (Miss. 2010). "Occasionally the question of whether the suit is barred by the statute of limitations is a question of fact for the jury; however, as with other putative fact questions, the question may be taken away from the jury if reasonable minds could not differ as to the conclusion." ***Smith v. Sanders***, 485 So. 2d 1051, 1053 (Miss. 1983). The party asserting a statute-of-limitations has the burden of proving it. ***Id.***

¶17. Mississippi law imposes a two-year limitations period on claims for injuries or death caused by medical negligence:

> [N]o claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, institution for the aged or infirm, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.

Miss. Code Ann. § 15-1-36(2) (Rev. 2012). The focus of Section 15-1-36(2) "is upon the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that he probably has an actionable injury." ***Smith v. Sanders***, 485 So. 2d 1051, 1052 (Miss. 1986). Thus, the statute of limitations does not begin to run until the plaintiff "(1) has knowledge of the injury, (2) has knowledge of the cause of the injury, and (3) knows the relationship between the practitioner and the injury." ***Stringer v. Trapp***, 30 So. 3d 339, 342 (Miss. 2010) (citing ***Sanders***, 485 So. 2d at 1053). Applying this standard, this Court has focused on "when a plaintiff, exercising reasonable diligence, should have first

10

discovered the negligence, rather than the injury." ***Sutherland v. Estate of Ritter***, 959 So. 2d 1004, 1008 (Miss. 2007).

¶18.   In its order granting the defendants' motion for partial summary judgment, the trial court found that the statute of limitations began to run on August 24, 2010, when Shirley's patient profile at the Semmes Murphy Clinic stated that her brain was flooded with IV fluids during her admission at NMMC-West Point and identified numerous behavioral issues that had resulted from that treatment.  While noting that Shirley apparently did not know that she suffered specifically from CPM, the trial court concluded that "on August 24, 2010, she (1) know she was suffering from a neurological deficiency; and (2) she at least suspected that this deficiency was the result of the procedure performed at [NMMC-West Point]."   On appeal, Pollan argues that the trial court misapplied the discovery rule in Section 15-1-36 because discovery of Shirley's injury required a medical diagnosis of CPM, "not merely a suspicion as to the condition or its causation."  Because Shirley was not diagnosed with CPM until after her death, Pollan argues that the trial court erred in concluding that the statute of limitations began to run prior to her death.

¶19.   Pollan's contention that a specific medical diagnosis is required for the statute of limitations to commence in a medical negligence case is not supported by this Court's precedent. "[A]lthough a hidden or unseen injury might very well serve to trigger the discovery rule and toll the statute of limitations, it is not because the injury itself is hidden or unknown, but rather because the negligence which caused the injury is unknown." ***Sutherland***, 959 So. 2d at 1008.  In ***Sutherland***, the plaintiff brought suit against the

11

defendant for negligently prescribing the drug Zyprexa, which caused the plaintiff to suffer from tardive dyskinesia ("TDS"). *Id.* at 1006. The trial court granted the defendant's motion for summary judgment, finding that the plaintiff had stopped taking Zyprexa almost three years before filing his complaint. *Id.* On appeal, the plaintiff argued that the discovery rule contained in Section 15-1-36 tolled the statute of limitations until he was diagnosed with TDS. *Id.* at 1008. This Court rejected the plaintiff's argument, finding that the plaintiff's "own suspicions and actions thereon" were sufficient to show that he had knowledge of the defendant's alleged negligence prior to being diagnosed with TDS. *Id.* at 1009. The record indicated that the plaintiff knew shortly after his treatment by the defendant that Zyprexa was causing undesired side-effects, and he even checked himself in to the hospital because, by his own admission, "[t]he Zyprexa was destroying my life[.]" *Id.* Accordingly, this Court found that the plaintiff "knew who, when, how, and by what he had been injured soon after receiving treatment and the Zyprexa prescription from [the defendant] and certainly no later than the date of his discharge from St. Dominic." *Id.*

¶20. This Court's holding in *Sutherland* makes clear that the discovery rule in Section 15-1-36(2) focuses not on the date of a specific diagnosis, but rather the date on which the plaintiff knew or should have known she was injured and that defendant's negligent conduct caused the injury. *See also Jackson Clinic for Women, P.A. v. Henley*, 965 So. 2d 643, 650 (Miss. 2007) ("[T]he plaintiff's own suspicions regarding possible negligent conduct starts the clock running."). In a similar context, this Court has rejected a rule that would toll the statute of limitations in medical negligence cases pending the plaintiff's review of medical

records. ***Sarris v. Smith***, 782 So. 2d 721, 725 (Miss. 2001). "[A plaintiff] might gain actual knowledge of negligent conduct through personal observation or other means; such plaintiffs are not entitled to wait until they have medical records before the statute begins to run." ***Id.*** Accordingly, "the statute [of limitations] should begin to run when the plaintiff should have reasonably known *of some negligent conduct*, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent." ***Id.*** (emphasis added). Here, the date of Shirley's diagnosis of CPM is not relevant to the running of the statute of limitations if she previously knew or should have known that the defendants' negligent conduct caused her injury. Accordingly, we find that the trial court did not misapply Section 15-1-36(2).

¶21. Pollan cites ***Schiro v. American Tobacco Co.***, 611 So. 2d 962 (Miss. 1992), to support the proposition that a diagnosis is necessary for a plaintiff to have sufficient knowledge of his or her injury to bring suit. But ***Schiro*** is legally distinguishable from the instant case. In ***Schiro***, the plaintiff sued the defendant tobacco company for negligence to recover for injuries she sustained as a result of cigarette smoking. ***Id.*** at 962. The sole issue in ***Schiro*** was whether the statute of limitations began to run when the plaintiff was diagnosed with cancer, or several years earlier, when the plaintiff began experiencing health problems that she believed were attributed to smoking. ***Id.*** at 963. But unlike the instant case, the applicable statute of limitations in ***Schiro*** was Section 15-1-49, which focuses solely on discovery of the injury. ***Id.*** at 965 (quoting Miss. Code Ann. § 15-1-49). "[C]omparing the discovery rules in the medical-malpractice statute and the 'catch-all' statute, we have one which focuses on discovery of the date of the wrongful conduct, and another which focuses

on the date of discovery of the injury or disease." ***Caves v. Yarbrough***, 991 So. 2d 142, 155 (Miss. 2008). Accordingly, this Court in ***Schiro*** correctly focused on the date on which the plaintiff knew of her injury. But here, the focus is on when Shirley knew of the defendants' negligent act or omission that caused her injury.

¶22. Pollan also contends that the statute of limitations could not have begun to run during Shirley's lifetime because several physicians told Shirley that she did not have CPM. Specifically, Pollan relies on Shirley's chart from the Semmes Murphey Clinic, which indicates that Dr. Chen did not believe that Shirley had CPM. Pollan cites several cases in which this Court has found that a physician's advice to the plaintiff served to toll the statute of limitations. *See **Neglen v. Breazeale***, 945 So. 2d 988, 990 (Miss. 2006); ***Parham v. Moore***, 552 So. 2d 121, 122 (Miss. 1989); ***Pittman v. Hodges***, 462 So. 2d 330, 332 (Miss. 1984). But in those cases, the defendants' own assurances to the plaintiffs had caused the plaintiffs to delay the investigation of their claims. *See, e.g., **Pittman***, 462 So. 2d at 333 ("Hodges was entitled to rely upon Dr. Pittman's statements that the numbness would temporarily last from two to six weeks or even longer, and only thereafter could Hodges then by the exercise of reasonable diligence have known or discovered that his numbness was permanent . . . ."). Pollan does not allege that any of the defendants in this case provided Shirley with any information that would have caused her to delay the investigation of her claim.

¶23. In addition, while Dr. Chen expressed his belief that Shirley did not suffer specifically from CPM, the record reflects that Shirley did not simply rest in reliance on that opinion.

14

Shirley's patient chart from an October 19, 2010, visit to Baptist Memorial Hospital-Golden Triangle provides, "The son reports to me that based on his research, the serum sodium was corrected very rapidly resulting in what was ultimately diagnosed as [CPM] . . . . Her mental status apparently never quite returned to baseline." Similarly, Shirley's record from a visit with Gentiva Home Health on October 22, 2010, states, "the [patient] reports [history] of severe sodium depletion in 2008 that was possibly misdiagnosed [and treatment] that caused deep brain damage based upon report from family members . . . ." Each of these records illustrates Shirley's belief that her neurological deficiencies were caused by the defendants' negligent medical treatment at NMMC-West Point. And even if we found that the statute of limitations began to run on October 22, 2010, rather than August 24, 2010, Pollan's survival claims still would be time-barred.

¶24.    Finally, Pollan argues that summary judgment was improper in this case because a genuine issue of material fact exists concerning the date on which the statute of limitations began to run. In support of this argument, Pollan points to the fact that he and the defendants identified two different dates on which the statute of limitations could have commenced, and the trial court selected a third date not argued by either of the parties. Based on this discrepancy, Pollan asserts that a factual dispute clearly exists and that his survival claims should have been submitted to the jury.

¶25.    We find that Pollan's argument is without merit, as reasonable minds could not differ as to when Shirley knew of her injury, the cause of the injury, and the relationship between the defendants and the injury. *See Sanders*, 485 So. 2d at 1053. As previously discussed,

Shirley plainly was aware of her cognitive deficiences beginning as early as her discharge from NMMC-Tupelo in October 2008. Thus, despite Pollan's arguments regarding Shirley's diagnosis of CPM, it is indisputable that Shirley was aware of her injury by August 24, 2010, the date selected by the trial date. We also agree with the trial court's determination that, on August 24, 2010 – the date on which Shirley's patient profile at the Semmes Murphey Clinic was completed – Shirley knew or at least suspected that her cognitive deficiencies were the result of her blood sodium levels being corrected too quickly during her admission to NMMC-West Point. Applying our holdings in *Sutherland* and *Henley*, these suspicions, coupled with the numerous other references in Shirley's medical records to rapid sodium correction and CPM, were sufficient to commence the running of the statute of limitations for Pollan's survival claims. And because Pollan's complaint was filed more than two years after August 24, 2010, the trial court correctly concluded that Pollan's survival claims were time-barred. Accordingly, we hold that the trial court did not err in granting the defendant's motion for partial summary judgment as to Pollan's survival claims.

## CONCLUSION

¶26.    For the foregoing reasons, we affirm the judgment of the Clay County Circuit Court.

¶27.    **AFFIRMED.**

**RANDOLPH, P.J., COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND ISHEE, J.**

**KING, JUSTICE, DISSENTING:**

16

¶28. In wrongful-death actions sounding in medical negligence, the statute of limitations for survival claims does not begin to run until the patient reasonably can be held to have known of the causative relationship between her injury and the conduct of the medical practitioner. *Neglen v. Breazeale*, 945 So. 2d 988, 990 (Miss. 2006) (citations omitted). The autopsy report in this case definitively revealed for the first time that the patient's neurological injury had resulted from the rapid correction of her sodium levels after a period of severe hyponatremia. No doctor accurately had diagnosed the cause of the patient's injury during her lifetime. In fact, two medical specialists stated that her injuries had not resulted from the treatment of her hyponatremia. Because no doctor accurately had diagnosed the cause of Shirley Pollan's (Shirley) neurological deficits and because specialists in the field explicitly had denied a causative relationship between her medical treatment and injuries, I dissent from the majority's finding that Pollan's survival claims were barred by the statute of limitations.

¶29. Pursuant to Mississippi Code Section 15-1-36(2), claims for survival are barred unless brought within two years from the date the alleged act was or with reasonable diligence should have been first discovered. Miss. Code Ann. § 15-1-36(2) (Rev. 2012). The "statute of limitations begins to run when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner." *Neglen v. Breazeale*, 945 So. 2d 988, 990 (Miss. 2006) (citations omitted). So, until the plaintiff "(1) has knowledge of the injury, (2) has knowledge of the cause of the injury, and (3) knows the relationship between the practitioner

17

and the injury," the discovery rule is tolled. ***Stringer v. Trapp***, 30 So. 3d 339, 342 (Miss. 2010) (citation omitted).

¶30.    Here, Shirley's family diligently attempted to determine the cause of Shirley's condition after her bout with severe hyponatremia. Shirley's family transferred her from NMMC-West Point to NMMC-Tupelo, where her treating physicians at NMMC-Tupelo were perplexed as to Shirley's mental status changes. Shirley's chart stated:

> IMPRESSION: Mental status changes/neurologic changes. Worried about the possibility of fluid shifts within the brain with these low sodiums versus a cerebrovascular accident.

Thus, the doctors were concerned that Shirley's neurologic changes might have resulted from a cerebrovascular accident – a stroke. One of Shirley's physicians ordered an MRI scan to see any evidence of central pontine myelinolysis (CPM) in Shirley's brain stem. The MRI revealed no demyelination in the brain stem. On October 12, 2008, Shirley's chart stated that CPM could have a delay in showing up on an MRI and stated that another MRI should be taken in forty-eight hours to a week.

¶31.    Shirley returned to NMMC-Tupelo on October 19 and was diagnosed with a behavior disorder. On October 21, Dr. Loden stated that he was "very perplexed as to whether this is organic from her recent sodium swings or whether it may be a new psych issue. She certainly has some psychotic type features." Shirley had a repeat MRI. The MRI again showed no sign of CPM. Shirley's following medical visits included diagnoses of delirium, anxiety, and bipolar disorder. Thus, in her barrage of doctors' visits following her episode of severe

18

hyponatremia, Shirley's health-care providers treated her for bipolar disorder and anxiety, not for CPM.

¶32. Moreover, two of Shirley's treating physicians had ruled out CPM as a cause. Dr. Feiyu Chen, a recommended physician specializing in the field of neurology, specifically stated that he did not think Shirley had CPM. And Dr. John Brockington opined that, "[t]he pons does not appear to be involved, but I do think that the patient's cognitive impairment is directly due to the effects of the hyponatremia . . . ." Dr. Brockington, another specialist in the field, did not state that Shirley's mental condition had been the result of the *treatment* of her hyponatremia, but instead attributed her condition to the hyponatremia itself. Shirley was admitted to Baptist shortly after her visit with Dr. Brockington. Her chart stated, "[a]pparently multiple scans were done and were reviewed by neurology and felt as though the patient had develop[ed] permanent cerebral damage possibly related to her severe electrolyte abnormalities in October of 2008." Again, her chart did not state that Shirley's neurological deficits had been caused by the treatment of her hyponatremia, but instead was "related to her severe electrolyte abnormalities." Accordingly, I believe that Shirley was entitled to rely on her physicians' opinions that she did not have CPM.

¶33. "[I]n Mississippi, when a valid factual dispute exists, the issue is settled by the finder of fact, a jury. It is only when reasonable minds cannot differ that it becomes settled as a matter of law." *Huss*, 991 So. 2d at 166; *see also Holaday*, 169 So. 3d at 850 ("This Court has held that '[d]iscovery of an injury "is an issue of fact to be decided by a jury when there is a genuine dispute."'"). The statute of limitations has been tolled in cases in which a patient

19

develops serious complications after a medical procedure but has no reason to know that the doctor's negligence in performing the procedure caused the complications. *Huss v. Gayden*, 991 So. 2d 162, 166 (Miss. 2008) (quoting *Sutherland v. Estate of Ritter*, 959 So. 2d 1004, 1008 (Miss. 2007)). There, this Court explained that a statute of limitations also may be tolled upon reasonable reliance on a physician's estimate and/or opinion as to recovery or risk. *Id.* at 167. As this Court has held, "a layperson undergoing a surgical procedure trusts in and relies on the instructions, professional expertise and guidance of his or her physician." *Neglen*, 945 So. 2d at 991 ("[W]e cannot conclude as a matter of law that Lillian did not act diligently by trusting the doctors' opinions and waiting over two years before requesting James'[s] medical records.").

¶34.    If even medical doctors specializing in the particular field could not determine whether Shirley's neurological changes resulted from her severe hyponatremia or from the results of her treatment of hyponatremia or from some other cause, a jury question exists as to whether Shirley should have known of her neurological injuries and the correlation to the treatment of her hyponatremia. Had Pollan filed a lawsuit before the autopsy report revealed that Shirley's cause of death was CPM, Shirley's own physicians' opinions would have been that she did not have CPM. Based on the medical opinions that Shirley had been provided at that point, a jury question would have existed as to whether Shirley had been injured from her treatment at all, or if her neurological deficits had been the result of her sodium depletion itself or from another unknown cause.

¶35. Although the majority cites ***Sutherland***, 959 So. 2d at 1004, this case clearly can be distinguished. There, the plaintiff had experienced negative side effects after taking Zyprexa. ***Id.*** at 1005. The plaintiff admittedly knew that his injuries directly resulted from taking Zyprexa, but he did not know the specific medical terminology for his condition. ***Id.*** at 1007. The facts showed that the plaintiff had known "who, when, how, and by what he had been injured soon after receiving treatment. . . ." ***Id.*** However, this Court emphasized that:

> [I]n medical negligence cases, we must focus our inquiry on when a plaintiff, exercising reasonable diligence, should have first discovered the negligence, rather than the injury. . . . For instance, a patient who undergoes a medical procedure may develop serious complications which are clearly known. However, if the patient has no reason to know that the doctor's negligence in performing the procedure caused the complications, the discovery rule will apply, even though the injury itself is not latent at all.

***Id.*** at 1008.

¶36. Pollan signed an affidavit stating that Shirley's doctors never had advised Shirley that her post-October 8, 2008, conditions were the result of her past medical treatment. Pollan also swore that her doctors had not advised him that she had been suffering from CPM due to rapid sodium correction. Pollan has shown a genuine issue of material fact as to when Shirley or her family should have discovered "the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner." ***Neglen***, 945 So. 2d at 990. After a myriad of physicians and appointments, no doctor definitively stated that Shirley had developed CPM. Because I believe that genuine issues of material fact remain on the question of whether Shirley should have known of the correlation

between her treatment on October 8, 2008, and her resulting injury, I would reverse the decision of the circuit court and remand for a trial on the merits. Therefore, I dissent.

**KITCHENS, P.J., AND ISHEE J., JOIN THIS OPINION.**