# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01042-COA

**SANDRA E. HEISER, INDIVIDUALLY AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF ADAM CHRISTOPHER HEISER, DECEASED**  APPELLANT

**v.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/27/2024 |
| TRIAL JUDGE: | HON. CHARLES W. WRIGHT JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM T. MAY |
| | RIMEN BRAR SINGH |
| ATTORNEYS FOR APPELLEE: | MICHAEL F. MYERS |
| | CALEB DOUGLAS STEPHENSON |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 02/24/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND WEDDLE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Adam Christopher Heiser was pronounced dead at approximately 5 a.m. on March 5, 2019, after he had spent the evening and early morning hours with his friend, Hannah Linton, driving around in Adam's pickup truck. Adam had an automobile insurance policy issued by State Farm Mutual Automobile Insurance Company (State Farm) in effect at the time. This appeal involves an uninsured-motorist coverage dispute arising from Adam's death.

¶2. Following Adam's death, his mother, Sandra Heiser, filed a complaint against Hannah and State Farm. As addressed in more detail below, Heiser claimed that after driving Adam

to her home in his truck, Hannah negligently assisted Adam from his truck and then allowed him to lie incapacitated outside his truck in the frigid cold for at least two hours before seeking assistance. Heiser claimed Hannah's negligence was the proximate cause, or a proximate cause, of Adam's death. Heiser also asserted, inter alia, a claim for uninsured motorist benefits[1] against State Farm.

¶3. After the parties exchanged written discovery and Hannah was deposed, State Farm moved for summary judgment, asserting, in relevant part, that State Farm's policy did not afford uninsured motorist benefits or medical payments benefits under the circumstances giving rise to Adam's death. The Lauderdale County Circuit Court agreed and granted summary judgment in State Farm's favor.[2] Heiser appeals. Finding no error, we affirm the circuit court's August 21, 2024 order granting summary judgment in State Farm's favor and the August 27, 2024 judgment of dismissal as to State Farm only, dismissing Heiser's case against State Farm with prejudice.

**PROCEDURAL HISTORY AND STATEMENT OF FACTS**

**I.     Procedural History**

¶4. Heiser, individually and on behalf of Adam's beneficiaries, filed her complaint against Hannah and State Farm on January 27, 2022. Heiser asserted a wrongful death claim against

---

[1] On appeal, State Farm did not contest Hannah's uninsured driver status.

[2] Heiser also asserted a bad faith claim against State Farm that State Farm also addressed in its summary judgment motion. Heiser later conceded to the arguments in State Farm's motion regarding the claims of bad faith, punitive damages, and extracontractual damages of any type. The circuit court entered partial summary judgment on those claims on March 18, 2024. Those claims are not at issue here.

Hannah, alleging that Hannah left Adam in the "frigid" cold for at least two hours following her unsuccessful attempt "to remove Adam from his truck and move him inside her home" after their evening together. According to Heiser, Hannah "took over two hours to provide reliable assistance to Adam as he lay freezing outside on the ground." Heiser further alleged that Adam developed hypothermia and that Hannah's negligence proximately caused or was a proximate cause of Adam's death. Heiser also named State Farm as a defendant in her complaint, asserting, inter alia, a claim for uninsured motorist benefits,[3] and she sought damages that included "medical expenses sustained by Adam" and "funeral and burial expenses sustained by [Heiser]." The defendants filed their answers and defenses, the parties exchanged written discovery, and Heiser deposed Hannah.

¶5.     Over a year and a half from the time Heiser filed her complaint, State Farm moved for summary judgment, asserting that "[a]ll the evidence points to the fact that Adam died of a drug overdose" and that State Farm was entitled to summary judgment on Heiser's "unsupported" theory that Adam died of hypothermia. State Farm further asserted that regardless of whether Adam died because of a drug overdose or hypothermia, its policy does not afford Adam medical payments or uninsured motorist benefits.

¶6.     In response, Heiser asserted that Adam died of hypothermia and that State Farm's policy covers Adam's death and related expenses. Heiser also filed an "Alternative Motion

_____

[3] As addressed in further detail below, Hannah drove Adam's truck to her home that evening. The uninsured motor vehicle coverage under State Farm's policy defines an "Insured" as including "any other person while occupying . . . your car . . . . Such vehicle must be used with the express or implied permission of you." In her deposition, Hannah confirmed that when she drove Adam's truck that evening, she did so with Adam's permission. On appeal, State Farm did not contest Hannah's uninsured driver status.

for Extension of Time to Continue State Farm's Motion for Summary Judgment" in which Heiser sought additional time to take the Rule 30(b)(6) deposition of State Farm and to designate her medical expert. *See* M.R.C.P. 30(b)(6). The record does not contain any notice setting this motion for hearing.[4]

¶7.     The circuit court conducted a hearing on State Farm's motion on February 13, 2024. At no time prior to this hearing—over two years from the date Heiser filed her complaint—did Heiser designate an expert or seek any further discovery. The circuit court judge granted summary judgment on Heiser's claims under the policy on August 21, 2024, finding as follows:

> In the present case, the only evidence for [Adam's] . . . cause of death . . . is the State Medical Examiner's report which states that [Adam] died from a suspected Xanax overdose. There is absolutely no evidence in the record that [Adam] died from hypothermia other than [Heiser's] bare speculation. Either way, neither of these causes of death would be covered under [State Farm's] insurance policy. This Court fails to see a connection between either offered cause of death and the use of [Adam's] truck that evening which would be covered by [State Farm's] insurance policy.

¶8.     Judgment pursuant to Mississippi Rule of Civil Procedure 54(b) was entered on

---

[4] At the February 13, 2024 hearing on State Farm's motion for summary judgment, Heiser's counsel told the circuit court judge that Heiser had filed an alternative motion to continue State Farm's motion to allow additional discovery. The circuit court judge noted, "But you hadn't called up the motion. I'm looking at the docket sheet." Heiser's counsel, nevertheless, requested the circuit court judge to "entertain consideration of that motion before any ruling of summary judgment." The circuit court's August 21, 2024 order granting summary judgment in State Farm's favor on Heiser's claims under the policy did not address Heiser's alternative motion for a continuance. Heiser has raised no issue on appeal regarding that motion. Accordingly, any issue relating to Heiser's alternative motion for a continuance is not before this Court.

August 27, 2024.  Heiser appealed.[5]

## II.    Statement of Facts

¶9.    These facts are developed from the pleadings, filings, and exhibits in the record, particularly the documents filed in support of State Farm's motion for summary judgment and Heiser's response.  No additional exhibits or documents were presented at the hearing on State Farm's summary judgment motion.

¶10.    Hannah testified in her deposition that the night before Adam died, he contacted her on Snapchat, a multimedia messaging application, asking whether she knew where to buy Xanax.  After Hannah agreed to reach out to some people to buy some Xanax, Adam picked her up from her grandparents' home (where Hannah also lived) on Fairway Drive, in Meridian, Mississippi.  Hannah said that she believed it was around 9:30 p.m. when Adam picked her up, and she confirmed that she saw nothing that indicated to her that Adam had any "substances in his system" at that time.

¶11.    Adam drove them to a Texaco station, and Hannah bought some Xanax from the person she knew, using Adam's money.  Hannah said that she had a fourth of a Xanax tablet that night.  She did not know how much Xanax Adam took, but she "just remember[ed] him taking—taking it [(the Xanax)] and me saying, 'Whoa,' you know.  And he's like, 'I got myself.'  And I was like, 'Okay.'"

¶12.    After taking the Xanax, Adam and Hannah drove around for "hours" with Adam at

---

[5] The circuit court granted Heiser's motion to stay the case as to the claims against Hannah pending this appeal.

the wheel. They stopped at one point for Adam to go into another gas station to buy a six-pack of beer. Hannah did not know if Adam drank any of the beer. After they "[r]ode around some more," with Adam still driving, they stopped so Hannah could buy some marijuana. Adam did not use any of the marijuana Hannah bought that evening. The pair drove around some more, and then Adam pulled his truck over to take a break. Adam continued to drive the truck once they left that spot.

¶13.   Shortly after Adam began driving, however, Hannah said she noticed that he was "swerving," so she asked Adam if she could drive. Adam pulled over. Hannah confirmed that Adam was able to get out of the truck, walk around it, and sit in the passenger seat. Then, Hannah began driving Adam's truck. Hannah stopped the truck at another gas station to buy some food. When Hannah got back in the truck, she saw that Adam was asleep.

¶14.   At this point in her deposition, Hannah asserted her Fifth Amendment privilege against self-incrimination and refused to testify about any further events that evening, including questions about the drive back to her home and her efforts to assist or remove Adam from his truck when they got there. Hannah did, however, confirm that it was "cold and quite windy" that night. Hannah also confirmed that Adam was alive when he exited his truck, as follows:

> [BY COUNSEL
> FOR PLAINTIFF]: Up to the point that Adam exited the vehicle at your house, do you agree with me there's no doubt that he was still alive?
>
> LINTON:        Do I answer that?
>
> [BY COUNSEL

FOR DEFENDANT
LINTON]:          Give me a second to think.  You can go ahead and
                  answer it. . . .

LINTON:           Yes.

¶15.    Tracking data from Adam's phone shows that Adam arrived outside Hannah's home

at about 2:00 a.m. on March 5, 2019.[6]  Government weather data for March 5, 2019, show

that the temperatures outside between 2:00 a.m. and 6 a.m. were near or below freezing.[7]

¶16.    In her appellant's brief, Heiser refers to her own unsworn statements attached to her

discovery responses describing Heiser's recollection of what Hannah told her happened after

Hannah and Adam arrived at Hannah's home.  According to Heiser, Hannah told her that

Adam fell out of the truck as she attempted to remove him, as follows:

> Hannah says that she goes around to the passenger side and begins helping him
> get out.  She says that she believes he puts his arm around her neck to get out
> but when he steps out, he goes straight to the ground. (Adam's truck is a diesel
> and is very high off the ground).  Hannah says that when he steps out she
> keeps him from falling straight out of the truck and tries to break his fall to the
> ground.[8]

---

[6] The March 5, 2019 tracking data from Adam's phone was attached as Exhibit C to
Heiser's response to State Farm's motion for summary judgment.

[7] Government weather data for March 5, 2019, was attached as Exhibit F to Heiser's
response to State Farm's motion for summary judgment.

[8] Heiser's responses to State Farm's interrogatories and accompanying documentation
were attached as Exhibit B to Heiser's response to State Farm's motion for summary
judgment.  Heiser's interrogatory responses also include a copy of what appears to be text
messages between Heiser and an unnamed third person discussing what happened after
Hannah and Adam reached Hannah's home in the truck.  The unknown third person said,
"Once again [Mrs. Sandy] I am so sorry I don't understand how he [(Adam)] got on the
ground . . . I know, he would have been ok if she [(Hannah)] left him in the truck . . . [i]f he
was so unconscious he couldn't drive.  Who open a door when he was obviously knocked
out pretty hard and leaning on the door she opened[.]"

7

¶17.   Heiser also states in her reply brief that "Hannah negligently attempted to remove Adam, who was much larger than her, out of the Ford F-250 pickup truck causing him to fall to the ground." With respect to this statement, however, we observe that although Hannah admitted in the deposition that Adam was "a good bit bigger than [she was] at the time, height-wise and weight-wise," Hannah did *not* admit that she "attempted to remove Adam . . . out of the Ford F-250 pickup truck causing him to fall to the ground." Rather, as we have noted above, Hannah asserted her Fifth Amendment privilege with respect to the events that occurred once she and Adam reached her home.

¶18.   In any event, the emergency and medical records from the Metro Ambulance Service and Anderson Regional Medical Center[9] show that Hannah called 911 just before 4:00 a.m. The "Prehospital Care Report" completed by an ambulance emergency worker provides that the fire department was already at the scene when the ambulance service arrived. According to this report, "Fire department states, 'we don't exactly know what time he has been down, but we think maybe 5 minutes or so. We got here and started doing cpr. He is really, really cold. They are saying he took to[o] much Xanax.'" The narrative in this report further provides: "Unknown patient information. Unknown family/bystander Information. Bystander walked off and left scene."[10]  Adam was "unresponsive," and his skin was "cold,

_____

[9] Excerpts of Adam's emergency and medical records for March 5, 2019, were attached as Exhibit D to Heiser's response to State Farm's motion for summary judgment.

[10] From this narrative and the nurse notes from the hospital, Heiser asserts that "Hannah, regretfully, did not truthfully report what had happened to Adam. She misled emergency responders to believe she 'found' Adam on the ground and that he was only down on the ground for '5 minutes or so.'"

8

pale, [and] dry."

¶19.    The ambulance emergency workers tried to resuscitate Adam before transporting him to Anderson Regional Medical Center. Hospital records show that when Adam arrived there, he had a "mottled appearance [and his] skin was cold to the touch." His body temperature was only 86.1 degrees following over twenty minutes of attempts to heat him, which included hot packs, an ambulance "heater turned on full with blowers facing" him, and a rapid transfuser.

¶20.    An emergency room doctor declared Adam dead at 5:12 a.m. The State Medical Examiner's "Report of Death Investigation" categorized Adam's death as an accident and found that the probable cause of Adam's death was a "suspect[ed] Xanax overdose." Adam's death certificate also provided that his cause of death was "suspect[ed] Xanax overdose." A March 12, 2019 drug screening of Adam's blood and urine showed the presence of alprazolam (Xanax), amphetamines, methamphetamines, and fentanyl in Adam's system.

### III.    The Relevant State Farm Policy Provisions

¶21.    Regarding uninsured motor vehicle coverage, the State Farm policy at issue defines "Insured" to include "you" and "any other person while occupying your car . . . . Such vehicle must be used with the express or implied permission of you." (Emphasis omitted). In relevant part, the insuring agreement for uninsured motorist benefits provides:

> Insuring Agreements
> 1.      Under Uninsured Motor Vehicle Coverage (Bodily Injury), we will pay compensatory damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle. The

bodily injury must be:
a.      sustained by an insured; and
b.      caused by an accident that involves the operation, maintenance, or use of an uninsured motor vehicle as a motor vehicle[.]

(Emphasis omitted).

¶22. Regarding medical payments coverage, the policy defines "Insured" as "You . . . while occupying . . . your car," as well as "any other person while occupying . . . your car. . . ." The insuring agreement for medical payments benefits provides:

We will pay:
1.      medical expenses incurred because of bodily injury that is sustained by an insured and caused by a motor vehicle accident. . . .
2.      funeral expenses incurred for an insured who dies within three years immediately following the date of a motor vehicle accident if the death is a direct result of bodily injury sustained in such accident.

(Emphasis omitted). "Occupying" is defined under the policy as "in, on, entering, or exiting." The policy does not define "accident," "motor vehicle accident," "operation," or "use." Additionally, the policy does not contain exclusions or limitations for any alleged drug use by the insured or the operator of the vehicle.

**STANDARD OF REVIEW**

¶23. "This Court employs a de novo standard of review of a trial court's grant or denial of summary judgment." *United Servs. Auto. Ass'n v. Moffatt*, 334 So. 3d 165, 168 (¶15) (Miss. Ct. App. 2022). Pursuant to Mississippi Rule of Civil Procedure 56, "[t]he judgment sought shall be rendered . . . if the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

10

M.R.C.P. 56(c). "In this regard, we 'must view the evidence in the light most favorable to the nonmovant, and the moving party bears the burden of showing the absence of a genuine issue of material fact.'" *Moffatt*, 334 So. 3d at 169 (¶15) (quoting *Pollan v. Wartak*, 240 So. 3d 1185, 1190 (¶12) (Miss. 2017)).

¶24.     However, "[i]f the party opposing the motion is to avoid entry of an adverse judgment, he or she must bring forth evidence which is legally sufficient to make apparent the existence of triable fact issues." *Alexander v. Metro. Y.M.C.A.*, 411 So. 3d 177, 184 (¶21) (Miss. Ct. App. 2024) (quoting *Travis v. Stewart*, 680 So. 2d 214, 218 (Miss. 1996)). "[U]pon our de novo review, we 'must . . . determine whether a party has carried its summary-judgment burden based upon the evidence presented to the court,' which must be 'competent evidence under the requirements of Rule 56.'" *Back Bay Lawnscapes LLC v. Graham*, 420 So. 3d 949, 958 (¶25) (Miss. Ct. App. 2025) (quoting *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 91 (¶20) (Miss. 2013)). Further, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the dispute must be genuine, and the facts must be material." *Sanders v. Attala County*, 332 So. 3d 292, 299 (¶27) (Miss. Ct. App. 2021) (internal quotation marks omitted).

¶25.     In the event "the sole issue under consideration is the interpretation of the insurance policy, it presents a question of law that is reviewed de novo." *Miss. Farm Bureau Cas. Ins. Co. v. Powell*, 336 So. 3d 1079, 1083 (¶8) (Miss. 2022).

## DISCUSSION

**Do the circumstances surrounding Adam's unfortunate death trigger coverage under State Farm's policy?**

¶26. Heiser asserts that she presented sufficient evidence demonstrating that genuine issues of material fact exist as to whether the circumstances surrounding Adam's death afford her coverage under State Farm's policy for uninsured motorist benefits and medical payments benefits, precluding summary judgment in State Farm's favor.

¶27. As detailed above, the State Farm policy provides uninsured motorist benefits for "bodily injury an insured is legally entitled to collect from the . . . driver of an uninsured motor vehicle. The bodily injury must be caused by an accident that involves the operation, maintenance, or use of an uninsured motor vehicle." Regarding medical payments benefits, the policy provides, in relevant part, that State Farm will pay for "medical expenses incurred because of bodily injury that is sustained by an insured and caused by a motor vehicle accident[.]"

¶28. In this case, Heiser asserts that after driving Adam's truck to her home, "Hannah negligently attempted to remove Adam, who was much larger than her, out of the Ford F-250 pickup truck causing him to fall to the ground." According to Heiser, "[Hannah] caused Adam to go from being undoubtedly alive, safely seated, protected, and asleep inside the truck—to freezing on the ground outside turning pale, 'really really cold[,]' mottled, pulse[l]ess, and by all appearances dead." Heiser claims, "It is . . . apparent from the facts that Adam died from hypothermia. He was left outside on the ground [by Hannah] after exiting/falling from the vehicle for roughly two (2) hours!" From these asserted circumstances, Heiser claims that Adam's hypothermic death falls within the policy's coverage for medical payments and uninsured motorists because it was "an accident that

involves the operation, maintenance, or use of an uninsured motor vehicle as a motor vehicle" or "a motor vehicle accident."

¶29.    State Farm, on the other hand, asserts that the evidence in this case shows that Adam died from a drug overdose in the early morning hours of March 5, 2019. With respect to Heiser's assertions that Adam died of hypothermia, State Farm asserts that Heiser has presented no admissible evidence to support this theory sufficient to overcome summary judgment. State Farm further asserts that even if Heiser's assertions were taken as true, "both a drug overdose and hypothermia are too remote from the use of the automobile to fall under the policy's medical payments or uninsured motorist coverages"; thus, State Farm contends summary judgment in State Farm's favor should be affirmed.

¶30.    Upon our own review and analysis of the applicable caselaw, we find that even if Heiser had supported her hypothermia theory with sufficient evidence to overcome summary judgment, State Farm's policy does not afford benefits for uninsured motorists or medical payments under the circumstances in this case.[11] Accordingly, we affirm the circuit court's grant of summary judgment and dismissal with prejudice of Heiser's case against State Farm.

### A.    Insurance Contract Construction

¶31.    "In Mississippi, insurance policies[] are contracts, and as such, they are to be enforced according to their provisions." *Penn-Star Ins. Co. v. Thompson*, 368 So. 3d 1245, 1250 (¶21) (Miss. 2023). Any "[a]mbiguities[, however,] must be construed in favor of the insured." *Powell*, 336 So. 3d at 1084 (¶10). "[I]n interpreting an insurance policy, this Court should

---

[11] Heiser concedes that if Adam died of a drug overdose, then State Farm's policy would not afford coverage for his death.

13

look at the policy as a whole, consider all relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result." *Id.*

¶32. As we have noted above, the State Farm policy at issue here does not define "accident," "motor vehicle accident," "operation," or "use." In *Powell*, the Mississippi Supreme Court analyzed whether the circumstances in that case were covered under an automobile insurance policy providing coverage "for 'an auto accident . . . arising out of the ownership, maintenance, or use of any covered auto including loading and unloading thereof.'" *Id.* at 1085 (¶16). The policy at issue did not define "auto accident." *Id.* at 1083 (¶9). Addressing the construction of this language, the supreme court observed, "Although the words 'auto' and 'accident' have definite or generally accepted meanings, when used together, these two words do not express a clear and precise meaning. As such, the combined phrase is ambiguous." *Id.* at 1084 (¶11) (citation omitted). The supreme court further observed that "[t]he insurer cannot, by failing to define the terms 'auto accident' or to include any additional qualifying or exclusionary language, insist upon a narrow, restrictive interpretation of the coverage provided." *Id.*

### B. Coverage Under State Farm's Policy

¶33. Heiser contends that Adam's hypothermic death arose out of the use of his truck, citing *Powell* in support of her theory. In *Powell*, Anthony Powell owned a pickup truck that he had insured under an automobile insurance policy issued by Mississippi Farm Bureau Casualty Insurance Company (Farm Bureau). *Id.* at 1080 (¶1). Trent Craft, Carl Garner, and Powell were installing roof trusses in a pole barn using Powell's pickup truck and trailer. *Id.*

14

at 1081 (¶3). Powell operated the insured truck pulling a trailer with scaffolding set up in the bed of the trailer to access the installation of the trusses. *Id.* Powell would drive the truck and trailer to each truss and park the truck, and then Craft and Garner would climb on the scaffolding to install the trusses. *Id.* Before taking a lunch break, Powell turned off the truck, and Garner jumped from the scaffolding onto the bed of the trailer, which caused the truck to rock. *Id.* Craft was still on the scaffolding. *Id.* When the trailer rocked, Craft fell from the scaffolding, seriously injuring his eye on the trailer hitch. *Id.*

¶34. Powell sought coverage for the incident under the policy, and Farm Bureau unsuccessfully moved for summary judgment seeking a declaration that its policy did not provide coverage. *Id.* at (¶4). On interlocutory appeal, the supreme court affirmed the circuit court's denial of Farm Bureau's summary judgment motion. *Id.* at 1087 (¶28).

¶35. As noted, the Farm Bureau policy provided coverage for "an auto accident . . . arising out of the ownership, maintenance, or use of any covered auto including the loading and unloading thereof," *id.* at 1085 (¶16), and did not define "auto accident." *Id.* Farm Bureau contended that because "the truck and trailer were not moving at the time of the accident, they were not being used." *Id.* at (¶15).

¶36. The supreme court disagreed, first noting that "the policy has no provision that requires that either vehicle be moving" (i.e., the truck or the trailer), *id.*, and then recognizing that "[u]se extends to reasonably expected activities incidental to the operation of the vehicles. Such activities, to which insurance coverage has been held to apply, include entering and exiting the vehicle." *Id.* The supreme court found, "Craft's activities included

15

occupying a trailer in use and subsequently attempting to exit and unload from same, which proximately caused his injuries." *Id.*

¶37. Additionally, the supreme court noted that "[r]eading the policy as a whole, the policy defines 'occupying' as 'getting in, on, out or off,' providing that coverage applies when a person is exiting the vehicle, as Craft was attempting to get off the scaffolding and trailer for lunch." *Id.* at 1086 (¶20). Under these circumstances, the supreme court found that "[n]o intervening event occurred so unrelated to the use of the truck and trailer that it broke the chain of causation between Craft's use of the truck and trailer and his fall." *Id.*

¶38. The supreme court also pointed out that although "accident" was not defined, that term is generally "defined as 'a sudden event that is not planned or intended and that causes damage or injury.'" *Id.* at 1087 (¶27) (quoting *Accident*, Merriam-Webster Dictionary (11th ed. 2022)). Applying "the ordinary meaning of accident [to] the facts presented here," the supreme court found that "an accident occurred involving a covered auto. This sudden, unintended event caused serious injury on a trailer connected to a covered auto." *Id.*

¶39. Heiser asserts that like the incident in *Powell*, Adam's death in this case arose in the context of him "entering and exiting a vehicle," constituting a "use" under State Farm's policy. We disagree. In *Powell*, the supreme court explicitly recognized that "[w]hen a policy insures an automobile for the 'use' of the automobile, *the chain of causation between the use of the automobile and the injury must be direct*." *Id.* at 1085 (¶16) (emphasis added). Although the *Powell* court found that Farm Bureau's policy provided coverage in that case, the circumstances in *Powell* are wholly distinguishable. Craft was injured as he was "exiting

16

the vehicle" (i.e., "attempting to get off the scaffolding and trailer for lunch"). *Id.* at 1086 (¶20). The supreme court found a direct correlation "between Craft's use of the truck and trailer and his fall" under those circumstances. *Id.*

¶40.    In contrast, taking Heiser's assertions about the circumstances surrounding Adam's death as true, we find that Heiser does not allege that Adam died from exiting the vehicle but, rather, that he died of hypothermia because after he was removed from his truck, he was left lying outside in at-or-below freezing weather for two hours before Hannah sought help. Heiser asserts, for example, that "Adam was undoubtedly alive until becoming exposed outside to cold and windy weather" and that "[Adam's] death occurred upon him being exposed outside on the ground during a cold, quite windy winter, early morning." To be sure, Heiser also asserts that "[Hannah] caused Adam to go from being undoubtedly alive, safely seated, protected, and asleep inside the truck—to freezing on the ground outside" when she removed Adam from his truck. But Heiser consistently maintains that Adam died of hypothermia due to his *prolonged exposure* to the at-or-near-freezing temperatures. As such, we find that Hannah's allowing Adam to lie unprotected in the cold for two hours constitutes an "intervening event . . . that . . . broke the chain of causation between [Adam's death and the] . . . use of [his] truck" in this case. *Powell*, 336 So. 3d at 1086 (¶20). We find no direct causal link between Adam's alleged death from hypothermia and the use of his pickup truck under these circumstances.

¶41.    Heiser also relies on three supreme court cases to support her contention that State Farm's policy affords coverage in this case. *See Jackson v. Daley*, 739 So. 2d 1031, 1042

(¶¶42-43) (Miss. 1999); *Com. Cas. Ins. Co. v. Tri-State Transit Co.*, 190 Miss. 560, 1 So. 2d 221, 224-25 (1941); *Merchs. Co. v. Hartford Acc. & Indem. Co.*, 187 Miss. 301, 188 So. 571, 571-72 (1939). We are unpersuaded by Heiser's reliance on these cases because unlike here, the use or operation of the insured vehicle in each of these cases *created the dangerous situation* that allegedly caused the accident that the court found was covered by the policies at issue.

¶42. In *Tri-State*, for example, the supreme court found that the insured had a duty to defend a lawsuit brought against a bus company for the death of a bus passenger who died of pneumonia she allegedly contracted when she was forced to walk to work in the cold *after the bus she was riding broke down and the bus driver failed to provide other means of transportation. Tri-State*, 1 So. 2d at 224 (finding deceased "was caused to walk from the scene of the accident as a direct and proximate result of the bus becoming incapacitated to proceed to its destination . . . and the failure of the insured carrier to provide other transportation"). Similarly, in *Jackson*, the supreme court found coverage under a policy insuring the county for accidents arising out of the "use" of a county truck *where the county employees used a dump truck to transport dirt and left dirt piles along the road* that allegedly caused the plaintiff's son to crash later that evening. *Jackson*, 739 So. 2d at 1042 (¶42). And in *Merchants Company*, the supreme court found coverage under the insurer's policy insuring the company for accidents arising out of the "use" of the company delivery truck, when in the course of making deliveries, the truck went into a ditch and had to be extricated using several large poles; after extricating the truck, the driver proceeded with his route, leaving

18

the poles in the road. *Merchs. Co.*, 188 So. at 571-72. Later that night, a traveler in a passenger vehicle struck one or more of the poles and was injured. *Id.* at 572. The supreme court found that "*the use of the poles in extricating the truck and thence the driving away and leaving the poles in the road*" arose out of "the use and operation of the truck," and no intervening event occurred between the driver leaving the poles in the road and the subsequent accident. *Id.* (emphasis added).

¶43.    As noted, and as the italicized language relating to each case shows, the accident in each case was directly caused by circumstances created by the use of the covered vehicle. In contrast, the incident here—i.e., Adam's hypothermic death—was allegedly caused by Hannah leaving Adam lying in the cold for two hours without assistance. By Heiser's own account of the facts, these intervening circumstances caused Adam's death. We find no genuine issue of material fact that these circumstances had any direct or substantial correlation to the use or operation of Adam's truck when Hannah simply drove them to her home earlier that evening. Accordingly, we are unpersuaded by Heiser's assertions in reliance on the additional cases discussed above.

## CONCLUSION

¶44.    For the reasons we discussed above, we find that State Farm's policy affords no coverage under the circumstances in this case. Accordingly, we affirm the circuit court's order granting summary judgment in State Farm's favor and the dismissal of Heiser's case against State Farm with prejudice.

¶45.    **AFFIRMED.**

19

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. McDONALD AND LAWRENCE, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**